VAN COTT, BAGLEY, CORNWALL & McCARTHY
David A. Greenwood (1250)
Stephen K. Christiansen (6512)
50 South Main Street, Suite 1600
Post Office Box 45340
Salt Lake City, Utah 84145-0340
Telephone: (801) 532-3333
Facsimile: (801) 534-0058

DURHAM, JONES & PINEGAR
David L. Arrington (4267)
50 South Main Street, Suite 850
Salt Lake City, Utah 84145
Telephone: (801) 538-2424
Facsimile: (801) 538-2425

Attorneys for Plaintiff MK Gold Company

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| MK GOLD COMPANY, a Delaware corporation,<br>Plaintiff,<br><br>vs.<br><br>MORRISON KNUDSEN CORPORATION, a Delaware corporation,<br>Defendant. | **MK GOLD'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON SAN CRISTOBAL** |
| LEUCADIA NATIONAL CORPORATION, a New York corporation,<br>Plaintiff,<br><br>vs.<br><br>MORRISON KNUDSEN CORPORATION, a Delaware corporation, ROBERT A. TINSTMAN, an individual, STEPHEN G. HANKS, an individual, and JOHN DOES 1-10, individuals,<br>Defendants. | Civil No. 2:96-CV-935 S<br>Civil No. 2:98-CV-327 S<br><br><br>Honorable Ted Stewart<br><br>**ORAL ARGUMENT REQUESTED** |

Plaintiff MK Gold Company ("MK Gold"), pursuant to Fed. R. Civ. P. 56 and DUCivR 56-1, respectfully submits this memorandum in opposition to defendant Morrison Knudsen Corporation's ("MKC") motion for partial summary judgment on the nature of the San Cristobal Mine Project. For the reasons set forth below, the Court should deny the motion and proceed to the trial of this issue by jury.

## BACKGROUND

Morrison Knudsen's Motion for Summary Judgment Regarding the San Cristobal Project must be denied because there is a genuine issue of material fact as to whether Morrison Knudsen breached the Noncompete Agreement by pursuing and accepting the mining contract at San Cristobal. The Noncompete Agreement at the center of this litigation prohibits Morrison Knudsen from "engag[ing] in any activity with respect to any [Precious Metals] mine or project" unless, "based upon (i) the reasonable belief of Morrison Knudsen after due inquiry and (ii) a written report of an independent professional expert in mining or geology, [the mine or project] is expected over the life of the mine or project not to be primarily engaged in the mining of or not primarily result in the production of Precious Metals."

Under the Noncompete Agreement the relevant question with respect to Morrison Knudsen's participation in the San Cristobal Project is whether Morrison Knudsen, before "engaging in any activity with respect to [San Cristobal]," and based upon a report from an "independent professional expert," conducted a "due inquiry" and formed a "reasonable belief" that mining activities at San Cristobal would not be primarily engaged in the mining of

or not primarily result in the production of silver. This Court has already ruled that there are disputed questions of fact regarding MK Gold's damages arising out of Morrison Knudsen's participation in the San Cristobal Project that must be resolved by the jury.

Since that ruling, the MK Gold has discovered more facts indicating San Cristobal is a silver mine. MK Gold has filed the expert report of Frank McAllister which concludes that San Cristobal is now, and at all relevant times was, very much a silver mine. MK Gold has also uncovered dozens of instances, from 1997 through 2001, in which Apex Silver itself characterized San Cristobal as a silver project. Morrison Knudsen, by filing its Motion for Summary Judgment, is asking this Court to ignore MK Gold's expert report and ignore Apex Silver's own statements and conclude that San Cristobal is, as a matter of law, something other than a silver mine. Because all relevant factual questions surrounding Morrison Knudsen's participation in the San Cristobal Project are disputed, Morrison Knudsen's Motion for Summary Judgment must be denied.

## MK GOLD'S STATEMENT OF MATERIAL FACTS, INCLUDING DISPUTED MATERIAL FACTS

A.    THE NONCOMPETE AGREEMENT

1.    MK Gold and Morrison Knudsen entered into an Agreement Not to Compete (the "Noncompete Agreement") in connection with the initial public offering of MK Gold stock in December of 1993. A true and correct copy of the Noncompete Agreement is attached hereto as Exhibit "A."

2.    The Noncompete Agreement provided that Morrison Knudsen "shall not, and shall cause its Affiliates . . . not to, engage in the conduct of Business in any area of the world" for a term of ten years. *Id.*

3.     The Noncompete Agreement defined "Business" as "the business of mining

Precious Metals, [gold, silver and platinum] performing contract mining services for Precious

Metals mining projects and of owning interests in Precious Metals mining projects, including

the exploration for and development of such projects." *Id.*

4.     Under the Noncompete Agreement, Morrison Knudsen could not "engag[e] in

any activity with respect to any [Precious Metals] mine or project" unless, "based upon (i) the

reasonable belief of Morrison Knudsen after due inquiry and (ii) a written report of an

independent professional expert in mining or geology, [the mine or project] is expected over

the life of the mine or project not to be primarily engaged in the mining of or not primarily

result in the production of Precious Metals." *Id.*

x.     After executing the Noncompete Agreement, Morrison Knudsen took MK

Gold public through an Initial Public Offering ("IPO").  As a result of the MK Gold IPO,

Morrison Knudsen made 26 million dollars and retained 46.5 percent of MK Gold's stock.

*See* First Amended Complaint ¶ 17.  MK Gold later sold those shares to Leucadia for $22.5

million. *See id.* ¶ 37.

B.     APEX SILVER MINES, LIMITED

5.     Apex Silver Mines Limited ("Apex Silver") "was founded in 1993 to acquire

and develop attractive silver properties throughout the world."  Apex Silver S-1, Aug. 29,

1997 at 9.  For the Court's convenience, MK Gold has attached hereto as Exhibit "B" a

collection of Apex Silver SEC filings, press releases and other public statements.  Apex

Silver's Aug. 29, 1997 S-1 is found at Tab "1" to Exhibit "B."

6.     Apex Silver's 1997 S-1 Registration Statement states that Apex Silver "is one

of a limited number of mining companies with a primary focus on silver exploration, development and production." *Id.* at 7. As of February, 2001, exploration for and development of silver properties continued to be Apex Silver's primary focus. See Rule 30(b)(6) Deposition of Keith R. Hulley, Feb. 8, 2001 at 7 (relevant pages are attached hereto as Exhibit "C").

7. Apex Silver's "**sole activity** is exploration for and development of **silver** properties." Apex Silver 1998 Annual Report, pg 34 (emphasis added) (attached as Tab "2" to Exhibit "B").

8. Apex Silver's decisions to acquire its "silver exploration properties," including the San Cristobal Project, were "premised on several factors, including (i) the low price of **silver** relative to the price of other precious metals, (ii) a perception that **silver** supply and demand fundamentals were stronger than the then-prevailing price of silver suggested, (iii) the general scarcity of attractive publicly-traded **silver** companies and (iv) the perception of negative sentiment within the traditional **silver** mining community." Apex Silver S-1/A, Oct. 9, 1997 at 8 (emphasis added) (attached as Tab "3" to Exhibit "B"); see also Dep. of Keith R. Hulley at 16-17 (confirming accuracy of statements quoted above).

9. One reason Apex Silver chose to focus its exploration efforts on silver properties was to take advantage of the higher multiple that the securities markets placed on precious metals companies compared to companies that focused on base metals. *See* Hulley Dep. at 13-14.

10. In 1996, Apex Silver began exploring its properties in the San Cristobal region "and discovered the presence of a significant silver, zinc and lead deposit with the potential to

be developed as a large-scale open-pit mining project." Apex Silver Annual Report, March 26, 1999 at 27.

C.    MORRISON KNUDSEN'S FIRST BID

11.    Beginning in approximately April 1998, Morrison Knudsen began corresponding and meeting with Apex Silver to discuss mining opportunities at the San Cristobal Project. *See* Dep. of Leroy Wilkes, Jan. 18, 2001 at 4 (relevant pages attached hereto as Exhibit "D"); Memo from Steve Antony to Mark Blakely, Apr. 3, 1998 (attached hereto as Exhibit "E"). At that time, Morrison Knudsen itself referred to San Cristobal as "the San Cristobal **Silver** Project." *Id.* (emphasis added). From that time until late December, 1998, Morrison Knudsen pursued mining opportunities at San Cristobal without having obtained a report of an independent expert concluding that San Cristobal was not a precious metals mine. *See* "Independent Report on the Classification of the San Cristobal Mine, Bolivia," Dec. 1998 (hereinafter "Silver Report") (attached to Morrison Knudsen's Memo).

12.    During that same time period, Leroy Wilkes, a Morrison Knudsen executive, undertook the responsibility for conducting Morrison Knudsen's "due inquiry" to determine whether San Cristobal was a precious metals project. Declaration of Leroy Wilkes, July 2, 1999 ¶ 3 (attached to Morrison Knudsen's Memo).

13.    During his deposition, Mr. Wilkes testified that his "due inquiry" consisted of a handwritten "[c]alculation to determine the volumes of materials that were going to be produced from the [San Cristobal] project." Wilkes Dep. Jan 18, 2001 at 14 (Exhibit "D"). The calculations Mr. Wilkes made, however, were "thrown away" and no copies thereof were ever produced to MK Gold. *Id.* The calculations Mr. Wilkes made in conducting his "due

inquiry" were not time consuming; according to Mr. Wilkes they took only "a few minutes" and "were typically done on a scrap piece of paper." *Id.* at 15-16. Mr. Wilkes' calculations did not account for either mining or smelting costs associated with the operation of the mine. *Id.*

14.    Mr. Wilkes' "due inquiry" also included a review of industry information discussing San Cristobal, including press clippings and analysts' reports, that were provided to Mr. Wilkes by Morrison Knudsen mining group staff members. *Id.* at 14.

15.    One such document was a Salomon Smith Barney analyst's report on Apex Silver dated December 31, 1997. That report concluded that "during 2001, almost two-thirds of San Cristobal net revenues will come from silver, declining to about half in the ensuing several years." Salomon Smith Barney Report, Dec. 31, 1997 at 11 (attached hereto as Exhibit "F"). Although the Salomon Smith Barney report was in Morrison Knudsen's files, Mr. Wilkes had no recollection of ever seeing that statement or considering it when making his "due inquiry." Wilkes Depo. at 31. Keith Hulley, Apex Silver's President, testified that the Salomon Smith Barney Report accurately stated the projected metals in San Cristobal at the time the report was issued. *See* Dep. of Keith R. Hulley at 15 (confirming accuracy of Salomon Smith Barney Report as of date of that report).

16.    On July 7, 1998, a Morrison Knudsen internal memorandum indicated that Morrison Knudsen had "been following for some time the San Cristobal **Silver/Zinc/Lead** Mining Project." Memo from Steve Antony to Willard Keeney et al., July 7, 1998 (attached hereto as Exhibit "E") (emphasis added). That same memo indicated that "[t]he San Cristobal Mine project seeks to develop a world class **silver/zinc/lead** ore body." *Id.* (emphasis added).

17.     Stephen Antony was employed by Morrison Knudsen at the time Morrison Knudsen became interested in the San Cristobal Project. Mr. Antony testified in his deposition that, based on the information that had been disclosed to Morrison Knudsen in 1998, it was his understanding that San Cristobal "involve[d] the development of a minerals mine, which predominantly focuse[d] on silver production in addition to some other mineral commodities." Deposition of Stephen Antony, Dec. 7, 1998 at 9 (relevant pages are attached hereto as Exhibit "G"). Mr. Antony also testified that Ta Li, then a member of Morrison Knudsen's mining group, told Mr. Antony that for Morrison Knudsen to participate in the San Cristobal Project "they would probably have to portray the – the opportunity as a nonprecious metal opportunity and look at it from another perspective . . . we'd have to, you know, play the game to satisfy, you know, the noncompete agreement." *Id.* at 14.

18.     On October 27, 1998, Morrison Knudsen submitted a completed "Prequalifications Requirements Form for contract mining services at Andean Silver Corporation's San Cristobal project in Bolivia." *See* Letter from Mark Blakely to Chuck McGhee, Oct. 27, 1998 (attached hereto as Exhibit "H").

19.     On or about December 18, 1998, Morrison Knudsen received a complete copy of the Tender Documents relating to the San Cristobal Project. *See* Letter from Rolando Espinoza to Mark Blakely, Dec. 18, 1998 (attached hereto as Exhibit "I"). At that time, Morrison Knudsen was also asked to submit a bid on the project. *See id.* The package Morrison Knudsen received included 72 pages of "general information" regarding the San Cristobal Project.

20.     Leroy Wilkes, in conducting his "due inquiry," did not read the Tender

Documents that Apex Silver provided to Morrison Knudsen. Wilkes Dep. at 28.

21.    In late December, 1998, Douglas Silver, an expert retained by Morrison Knudsen., prepared a report for Morrison Knudsen purporting to evaluate the San Cristobal Project. *See* Silver Report. Mr. Silver did not review or consider the information contained in the Tender Documents in preparing his report or reaching the conclusions therein. *See id.* at 15.

22.    Although Mr. Silver was retained as Morrison Knudsen's "independent" expert, he is "very close friend[s]" with Ta Li, a key member of Morrison Knudsen's mining group. Dep. of Doug Silver, Jan. 26, 2001 at 69 (relevant pages attached hereto as Exhibit "J"). Additionally, Mr. Li's wife has been employed as Mr. Silver's assistant "for the last three or four years." *Id.* at 76.

23.    The Silver Report "inappropriately narrows the definition of the contractual terms" by "erroneously equat[ing] the terms 'primarily engaged in the mining of' and 'primarily resulting in the production of' with a defined industry terms 'Primary Metal.'" "An Evaluation of the San Cristobal Mining Project Owned by Apex Silver Mines Limited, Feb. 20, 2001 at 12 (hereinafter "McAllister Report") (attached hereto as Exhibit "K").

24.    The valuation in the Silver Report is based on "recoverable metals, and thus is simply a gross value of metals produced." Such a valuation is flawed and unreliable because it "fail[s] to consider the economics implicit in a basic calculation of [Net Smelter Returns]." McAllister Report at 12-13.

25.    The Silver Report states that Apex Silver characterized "the San Cristobal deposit [as] a zinc-lead-silver deposit," yet cites no instance in which Apex Silver so

characterized San Cristobal.  *See* Silver Report at 10.

26.    In fact, as of December, 1998, Apex had uniformly characterized San Cristobal as a "silver" or "silver-zinc" deposit:

- In an SEC filing, Apex Silver characterized the San Cristobal project as a "major **silver** development project."  Apex Silver S-1/A, Oct. 9, 1997 at 7 (emphasis added) (Tab "3" to Exhibit "B").

- In its 1997 Registration Statement, Apex informed investors that "[c]ertain mining operations, including the San Cristobal Project, may be dependent upon anticipated proceeds from the production of **secondary metals**," meaning metals other than silver.  Apex Silver S-1, Aug. 29, 1997 at 12-13 (emphasis added) (Tab "1" to Exhibit "B").

- After completing the "first phase feasibility study" on the San Cristobal Project, Apex Silver reported that "the San Cristobal Project may constitute one of the largest known mineable **silver** deposits in the world."  Apex Silver S-1/A, Oct. 9, 1997 at 7 (emphasis added).

- In a presentation to the Mining Investment Forum in October, 1998, Apex Silver referred to San Cristobal as a "World Class **Silver/Zinc** Deposit." Mining Investment Forum Presentation at 17 (emphasis added) (attached as Tab "4" to Exhibit "B").  See also id. at 25 ("San Cristobal's World Class Open Pit Silver/Zinc/Lead Deposit"); id. at 31 ("San Cristobal is World-Class, Low-Cost Open Pit Silver/Zinc/Lead Deposit").

27.    Both Doug Silver and Leroy Wilkes had copies of Apex's public documents

when they evaluated San Cristobal's project economics. *See* Silver Report at 15; Wilkes Dep. at 29.

28.    Doug Silver recognized that when a property owner "list[s] silver as the first product **[it] implies [silver] is the greatest contributor to revenues**." Silver Report at 9 (emphasis added). *see also* Letter from Doug Silver to Richard Parry, June 17, 1999 at 3 ("In the mining industry, **it is conventional to present the metals in the order of value contribution importance**.") (attached hereto as Exhibit "L") (emphasis added). Mr. Silver testified in his deposition that, in preparing his expert report, he reviewed "the public domain documents of the operators or owners of [the world's largest silver] deposits and seeing how they classified these deposits." Dep. of Doug Silver, Jan. 26, 2001 at 18-19 (relevant pages attached hereto as Exhibit "L"). Apex Silver, when describing San Cristobal in public documents prior to December, 1998, uniformly identified silver as San Cristobal's first product and has classified San Cristobal as a "silver-zinc" mine. *See* ¶ ___, above.

29.    On February 12, 1999, Morrison Knudsen submitted a bid for the mining services contract at San Cristobal.

30.    Apex Silver determined that it would not award the mining services contract to any of the bidders at that time; rather, Apex Silver used the information supplied in the bids "to determine what the likely cost of mining would be." Hulley Dep. at 25 (Exhibit "C").

D.    THE SAN CRISTOBAL FEASIBILITY STUDY

31.    On October 15, 1999, Apex Silver announced that the bankable feasibility study of the San Cristobal Project had been completed. *See San Cristobal Positive Feasibility Study Findings Confirmed*, Company News On-Call Press Release, Oct. 15, 1999 (attached as

Tab "5" to Exhibit "B"). That study "confirmed earlier positive feasibility study results related to the minerals processing facilities for San Cristobal, the Company's wholly-owned open-pit **silver-zinc** mining project." *Id.* (emphasis added).

32.    In performing his "due inquiry," Leroy Wilkes does not recall ever reviewing the feasibility study. Wilkes Dep. at 36 (Exhibit "D").

33.    At their depositions on February 8, 2001, Apex's President, Keith Hulley, and Apex's Chief Financial Officer, Mark Lettes, testified to their understanding of the results of the 1999 Feasibility Study. Neither Mr. Hulley nor Mr. Lettes ever testified that "the San Cristobal Project is very much a nonprecious metals project." MK Gold therefore disputes paragraph 9 of Morrison Knudsen's Statement of Undisputed Facts.

34.    Since the completion of the Feasibility Study, Apex Silver has continued to characterize San Cristobal as a "silver" or "silver-zinc" project in all its public filings and press releases:

>    • "The Company is focusing on advancing its project financing efforts and proceeding with basic engineering on San Cristobal, its wholly owned, open-pit **silver-zinc** project." *Apex Silver Mines Limited Completes Subsequent $10.5 Million Equity Offering; New Equity Raised Totals $97.1 Million*, Company News Press Release, Nov. 9, 2000 (attached as Tab "6" to Exhibit "B") (emphasis added).

>    • In its SEC filings, Apex Silver has consistently stated that its "**primary** focus is on mining silver," and that it "intend[s] to produce other metals associated with [its] silver deposits, such as zinc, lead, copper and gold, **if economically**

**practicable**." Apex Silver 10-K405, Mar. 26, 1999 at 2 (attached as Tab "7" to Exhibit "B") (emphasis added).

- "Bolivia: The San Cristobal District (**silver-zinc-lead**)." *Apex Silver Mines Limited Updates Worldwide Exploration Portfolio*, MBendi Press Release, Oct. 27, 2000 (attached as Tab "8" to Exhibit "B") (emphasis added).

- "The Company is focused on advancing the project financing of San Cristobal, its wholly-owned, open-pit **silver-zinc** project in the Potosi district of southwestern Bolivia." *Apex Silver Mines Limited Reports Loss for Third Quarter 2000*, MBendi Press Release, Oct. 26, 2000 (attached as Tab "9" to Exhibit "B") (emphasis added).

- "Based on the feasibility study, the Company anticipates developing a low cost, open pit **silver-zinc** mine." Apex Silver 8-K, Sept. 9, 1999 at 1 (relevant pages are attached as Tab "10" to Exhibit "B") (emphasis added).

- Apex referred to the Project as "the Company's wholly-owned open-pit **silver-zinc** mining project." *Apex Silver Mines Limited Announces Successful Completion of Feasibility Study on San Cristobal*, Company News On-Call Press Release, Sep. 7, 2000 (attached as Tab "11" to Exhibit "B") (emphasis added).

- As recently as February 15, 2001, Apex characterized the San Cristobal Project as its "wholly-owned, open-pit **silver-zinc** project." *Apex Silver Mines Limited Reports Results for 2000 Fourth Quarter and Full Year*, Company News On-Call Press Release, Feb. 15, 2001 (attached as Tab "12" to Exhibit "B") (emphasis added).

35.    After the feasibility study was finalized, Apex Silver stated publicly that "[o]ptioning properties that are **not predominantly silver** is allowing us to unlock the inherent value of out portfolio without diffusing our own exploration resources."  Apex Silver Annual Report 1999 (attached as Tab "13" to Exhibit "B") (emphasis added); see also Dep. of Keith R. Hulley at 18 (confirming accuracy of quoted statement).  Apex has never optioned its interests in San Cristobal; in fact, Apex Silver considers San Cristobal to be its "flagship" development project.  Apex 1999 Annual Report.

36.    In preparing a Definitive Proxy Statement in April, 2000, Apex Silver determined that it was appropriate to compare cumulative shareholder returns to the "Media General Silver Index, which includes **only companies with silver mining investments**."  Apex Silver Definitive Proxy Statement, Apr. 17, 2000 at 14 (emphasis added) (relevant pages attached as Tab "14" to Exhibit "B").

E.    MORRISON KNUDSEN'S SECOND BID

37.    On February 15, 2000, Morrison Knudsen submitted its second bid for the mining services contract at San Cristobal.  Morrison Knudsen Statement of Facts ¶ 8.

38.    Leroy Wilkes testified in his deposition that, prior to submitting Morrison Knudsen's second bid, he repeated his "due inquiry" by performing the same calculations he had performed earlier and reviewing the same types of documents he had reviewed in 1998. In performing his "due inquiry," Mr. Wilkes does not recall looking at any different documents than he reviewed when performing his initial calculations in 1998; specifically, Mr. Wilkes did not review the feasibility study.  After completing his calculations, Mr. Wilkes once again destroyed them.  Wilkes Dep. at 34-35.

39.    On September 12, 2000, Apex Silver notified Morrison Knudsen that it had

been awarded the mining services contract at San Cristobal.  *See* Letter from Keith R. Hulley

to Leroy Wilkes, Sep. 12, 2000 (attached hereto as Exhibit "M").

40.    Morrison Knudsen was awarded the mining contract at San Cristobal because

its bid "had the lowest cost" and "had met the technical requirements."  Dep. of Keith R.

Hulley at 37.

41.    In fact, by selecting Morrison Knudsen as the mining contractor, Apex Silver

will spend many millions of dollars less in developing and operating San Cristobal than it

originally anticipated.  Morrison Knudsen's proposal

> is 17 percent lower than what was assumed in the Feasibility Study for contract
> mining costs, which the Company believes makes it economically viable for
> the firm to provide contract mining services for the life of the mine.  This
> differs substantially from the Feasibility Study, which assumed San Cristobal
> converted to owner mining after five years of operation.  By eliminating the
> approximately $53 million in mining capital which had been assumed for
> conversion to owner mining, while at the same time retaining the Feasibility
> Study's low-cost operating economics, **the arrangements with Washington
> Group represent a significant enhancement to the Company's original
> plans.**

"Washington Group International Named Mining Contractor for San Cristobal," Company

News On-Call Press Release, Sep. 13, 2000 (attached as Tab "15" to Exhibit "B") (emphasis

added).

42.    Morrison Knudsen's profits from San Cristobal will be $62,724,000 over a ten

year period and $99,084,000 over the estimated life of the mine.  *See* Report of John Brough,

Feb. 26, 2001 at 6 (attached hereto as Exhibit "N").

F.    FRANK MCALLISTER'S EXPERT REPORT

43.    Francis R. McAllister, an expert retained by MK Gold, has filed a  report

concluding that:

- "proposed mining activities at San Cristobal, over the life of the mine, would be primarily engaged in the mining of silver, and primarily result in the production of silver";

- "MK could not have formed a reasonable belief that San Cristobal was not to be primarily engaged in the mining and production of silver"; and

- "Doug Silver's conclusions in his reports are incorrect."

Expert Report of Frank McAllister at 1-2, attached hereto as Exhibit "K." Based on the conclusions reached in Mr. McAllister's report, MK Gold disputes paragraphs 3, 4 and 6 of Morrison Knudsen's Statement of Undisputed Facts. Mr. McAllister reached those conclusions for two primary reasons. *Id.* at 4.

44.    First, Mr. McAllister found that it is "predominantly the intent and perspective of the mining company that will be determinative regarding the character of a mining project for a poly-metallic deposit when precious metals are involved." *Id.* at 3-4. Based on his review of representations made by Apex Silver, as well as market analysts and the general press, Mr. McAllister concluded that the intent and perspective of Apex Silver was that "San Cristobal was a silver project throughout all the relevant periods." *Id.* at 9. Considering the overwhelming volume of information from Apex Silver, industry analysts and the general press characterizing San Cristobal as a silver mine, "MK would have had to ignore available information in order to form a belief that San Cristobal would not be primarily engaged in the mining of and production of silver." *Id.* at 2.

45.    Second, Mr. McAllister concluded that project economics showed that silver

would be the dominant revenue generator at San Cristobal. Mr. McAllister determined that the most realistic and reliable method for determining project economics was through a Net Smelter Return ("NSR") calculation. An NSR calculation "provides the best measure of a mine's economics by metal." *Id.* at 10. That calculation "shows silver as the dominant value contributor, providing as much as 60% of the net revenues." *Id.*

46.     Third, it is well known within the mining industry that companies focusing on precious metals are valued at a higher premium compared with companies that focus on base metals like zinc and lead. Apex Silver certainly knew this, and deliberately chose to concentrate on silver to take advantage of the market premium. *See* Hulley Dep. at 13-14. "Apex Silver has sought and attained the stock market premium, thereby validating its strategy, generating financing and rewarding its shareholders. Apex Silver must therefore be primarily engaged in the mining of and production of silver to maintain the market premium conferred upon it as a recognized precious metal mining company." McAllister Report at 11.

47.     Mr. McAllister also concluded that Mr. Silver's "methodology and conclusions are flawed in that they fail to consider the economics implicit in a basic calculation of [Net Smelter Returns]." *Id* at 12. Mr. Silver's gross measurement of minerals to be produced at San Cristobal is simply not a realistic way to determine the classifications of a mine; rather, "net smelter returns provide a more complete measure of the economic of a mine. The NSR's for San Cristobal show that silver will be the dominant actual revenue contributor at the mine level." *Id.* at 13.

48.     The bottom line is that if costs of mining, shipping, smelting and refining are considered, as they must be, silver is San Cristobal's dominant revenue contributor. *Id.* at 12.

## ARGUMENT

### I.    STANDARD FOR SUMMARY JUDGMENT

As a matter of law, the movant must show entitlement to summary judgment beyond all reasonable doubt. The trial judge . . . must construe all pleadings, affidavits, and depositions liberally in favor of the party against whom the motion is made. Where different inferences can be drawn from conflicting affidavits, depositions and pleadings, summary judgment should not be granted. Accordingly, if doubt arises regarding any factual issue, the court must resolve the doubt in favor of the non-movant . . . and deny the motion.

*Alta Health Strategies, Inc. v. Kennedy*, 790 F.Supp. 1085, 1089-90 (D.Utah 1992) (internal quotations omitted). Here, numerous questions of fact remain in dispute concerning whether Morrison Knudsen's participation in the San Cristobal Project constitutes a violation of the Noncompete Agreement. MK Gold's evidence demonstrates that Morrison Knudsen did not conduct a "due inquiry" or obtain an "independent expert" report before engaging in "any activity" with regard to Apex Silver's San Cristobal project. That should have been the end of Morrison Knudsen's pursuit of San Cristobal. If any party is entitled to summary judgment on this issue, it is MK Gold. In any event, genuine issues of material fact exist regarding Morrison Knudsen's "due inquiry" and "reasonable belief," on Doug Silver's status as an "independent expert," and on whether San Cristobal is or was considered primarily a silver mine on or before Morrison Knudsen's 1998 bid and early 2000 bid on San Cristobal. For these reasons, Morrison Knudsen's Motion for Summary Judgment must be denied.

### II.    THE COURT HAS ALREADY HELD THAT MK GOLD'S DAMAGES CLAIMS BASED ON THE SAN CRISTOBAL PROJECT MUST GO TO THE JURY.

Morrison Knudsen previously asked this Court to exclude as evidence of MK Gold's damages any information concerning the San Cristobal Project, arguing that there was no

evidence to suggest that the San Cristobal Project was a "precious metals" project. This Court

unequivocally denied Morrison Knudsen's motion, holding that "[g]enuine issues of material

fact remain for trial, including with respect to damages alleged by MK Gold in connection

with the San Cristobal Mine." Order, Nov. 8, 2000. In the hearing on this matter, the Court

stated that "genuine factual issues exist as to the potential damage to MK Gold for the loss of

goodwill, damage that may result as a result of the operation of the Bullfrog project, *and*

*damages for violation of the noncompete agreement from the operation by MKC of the San*

*Cristobal project.*" Hearing Transcript at 84 (emphasis added).

Morrison Knudsen's one page argument supporting its Motion for Summary Judgment

simply reargues a motion this Court has already denied. However, the "issues of material fact

remain[ing] for trial," specifically those related to MK Gold's damages arising out of "the

operation by MKC of the San Cristobal project," have not disappeared in the last three

months. In fact, through discovery MK Gold has uncovered more facts supporting its

contention that San Cristobal was a silver mine when Morrison Knudsen "engaged in any

activity" regarding San Cristobal in early 1998, bid on San Cristobal in late 1998, and bid

again on San Cristobal in early 2000. Additionally, MK Gold has filed Mr. McAllister's

expert report concluding that San Cristobal is, and at all relevant times was, a silver mine. *See*

Facts ¶¶ 43-48.

III.    **THERE IS A GENUINE ISSUE OF FACT AS TO WHETHER MORRISON
        KNUDSEN'S INVOLVMENT IN THE SAN CRISTOBAL PROJECT IS A
        BREACH OF THE NONCOMPETE AGREEMENT.**

Morrison Knudsen's motion for summary judgment must be denied because there is a

genuine dispute concerning whether Morrison Knudsen breached the parties' Noncompete

Agreement by pursuing the San Cristobal project in early 1998, bidding on the San Cristobal

Project in late 1998 and early 2000, and by accepting the mining services contract on that

project in September, 2000.

Under the Noncompete Agreement, Morrison Knudsen was prohibited from engaging

in the business of precious metals mining or performing contract services for precious metals

mining projects, anywhere in the world, for a period of ten years.  The Noncompete

Agreement precluded Morrison Knudsen from "engaging in any activity with respect to any

mine or project" unless, "based upon (i) the reasonable belief of Morrison Knudsen after due

inquiry and (ii) a written report of an independent professional expert in mining or geology,

[the mine or project] is expected over the life of the mine or project not to be primarily

engaged in the mining of or not primarily result in the production of Precious Metals."  Facts ¶

4 (emphasis added).

Morrison Knudsen, in its motion for summary judgment, argues that because it (a)

claims to have performed due inquiry and formed a reasonable belief that San Cristobal is not

a precious metals project, and (b) acquired a written report from Doug Silver opining that San

Cristobal is not a precious metals project, Morrison Knudsen is not, as a matter of law,

precluded from performing mining services at San Cristobal.

First, the question of whether Morrison Knudsen performed a "due inquiry" and

formed a "reasonable belief" as to the nature of the San Cristobal Mine prior to engaging in

activity on the Project is inherently a question of fact that may not be resolved summarily.  It

is axiomatic that a party may not establish that it has acted reasonably simply by stating that it

has; if a party could prove it acted reasonably by simply testifying that it did, questions of

negligent or otherwise unreasonable behavior would never be tried. Rather, the question of "[w]hether Defendants [acted] reasonably given the totality of circumstances is a question for the jury to decide and is a matter with respect to which summary judgment is not warranted." *Jense v. Runyon*, 990 F.Supp. 1320, 1331 (D.Utah 1998). Morrison Knudsen did not conduct a "due inquiry" before engaging in any activity regarding San Cristobal, nor did it obtain an "independent expert" report before pursuing the project in earnest. Morrison Knudsen claims to have formed a "reasonable belief" that San Cristobal was not a silver mine, even though it ignored the December, 1997 Salomon Smith Barney report, found in Morrison Knudsen's own files, that concluded otherwise, and ignored the 10-K's, 10-Q's, annual reports and press releases of Apex Silver stating that San Cristobal was a silver mine. Morrison Knudsen also claims to have performed calculations regarding whether San Cristobal was a silver mine, yet Morrison Knudsen threw those calculations away, leaving no trace of physical evidence suggesting that any such calculations were ever performed.

Second, Morrison Knudsen's Motion for Summary Judgment must fail because there remains a genuine dispute as to whether the San Cristobal Project is in fact a precious metals project. MK Gold has retained an expert witness who will testify at trial that, based on a comprehensive review of project economics, "proposed mining activities at San Cristobal, over the life of the mine, would be primarily engaged in the mining of silver, and primarily result in the production of silver."

### 1. Whether Morrison Knudsen Conducted a "Due Inquiry" and Reasonably Believed San Cristobal was Not a Precious Metals Project is a Question of Fact

The question of whether Morrison Knudsen conducted a "due inquiry" and reasonably

believed that the San Cristobal Mine was not a precious metals mine when it pursued the

project in early 1998, bid on the project in late 1998 and early 2000, and at the time it

accepted appointment at the project are disputed questions of fact that must be resolved by the

jury. Morrison Knudsen had a contractual duty to undertake a "due inquiry" and form a

reasonable belief that any project it was interested in pursuing was not a precious metals mine,

and to obtain an independent expert report *before* it undertook any activity thereon. Morrison

Knudsen is not entitled to summary judgment unless the Court finds, as a matter of law, that

Morrison Knudsen, before engaging in any activity on San Cristobal, conducted a due inquiry

and formed a reasonable belief that San Cristobal was not a precious metals project, and

obtained the report of an independent expert concluding San Cristobal was not a silver project.

Accordingly, the relevant inquiry for this Court is whether Morrison Knudsen breached its

legal duty to MK Gold. "The issue of . . . breach of a legal duty, is normally a question of fact

for the jury." *Kitchen v. Cal Gas Co., Inc.*, 821 P.2d 458, 461 (Utah Ct. App. 1991). As a

disputed question of fact, this issue cannot be resolved summarily.

There is clearly a genuine factual dispute as to whether Morrison Knudsen conducted a

"due inquiry" and obtained an "independent" expert report before engaging in any activity on

the San Cristobal Project. In fact, it is undisputed that Morrison Knudsen had been pursuing

the San Cristobal Project for at least eight months before it obtained the Silver Report. *See*

Facts ¶¶ 11-21. During that time period, all the information that Apex Silver was

disseminating to the public characterized San Cristobal as a silver mine. *See* Facts ¶ 26.

Morrison Knudsen purportedly relied on those public statements in performing its "due

inquiry." *See id.* ¶ 14. Moreover, Salomon Smith Barney, an independent analyst whose

report Morrison Knudsen possessed, concluded that San Cristobal was very much a silver

mine. *See* Facts ¶ 15. Although Morrison Knudsen had that report in its files, it was ignored.

*See id.*  By actively pursuing a project that was clearly anticipated to result in the production

of precious metals without performing a "due inquiry" and without obtaining an expert report,

Morrison Knudsen breached the Noncompete Agreement beginning in April, 1998.

There is a genuine dispute as to whether Morrison Knudsen conducted a "due inquiry"

before bidding on the San Cristobal Project in December, 1998.  Leroy Wilkes was the

individual at Morrison Knudsen who, by his own testimony, single-handedly conducted the

due inquiry into the likely production at San Cristobal.  Mr. Wilkes' "due inquiry" consisted

entirely of hand-written calculations Mr. Wilkes made on "scrap piece[s] of paper." Facts ¶

13.  After making each calculation Mr. Wilkes threw it away because, in his words, "[t]here

was no reason to keep it." *Id.*  The only evidence suggesting that any such calculations were

ever made is the testimony of Mr. Wilkes.  A jury can certainly choose not to believe that Mr.

Wilkes ever made any such calculations, or to believe that the results of such calculations in

fact showed that the San Cristobal Project would primarily result in the production of silver.[1]

*See e.g. Moe v. Avions Marcel Dassault-Breguet Aviation*, 727 F.2d 917, 929-930 (10th Cir.

---

[1]  Furthermore, MK Gold will, at trial, request that the Court give a "spoliation" instruction based on Morrison Knudsen's destruction of such highly relevant evidence.  In the Tenth Circuit, "the general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." *Aramburu v. The Boeing Co.,* 112 F.3d 1398, 1407 (10th Cir. 1997).  Here, an agent of Morrison Knudsen prepared a calculation for the stated purpose of complying with the terms of the noncompete agreement.  At the time that calculation was allegedly prepared, Morrison Knudsen had already been sued by MK Gold for breach of that same agreement.  Accordingly, Morrison Knudsen must have known that a document purportedly proving Morrison Knudsen was not engaging in further breaches of that agreement was highly relevant to the pending litigation.  Nevertheless, Morrison Knudsen willfully destroyed the documents.  Under the circumstances the Court can easily infer that Morrison Knudsen destroyed the documents in bad faith, and that a spoliation instruction is warranted. (footnote continued on next page)

1984) ("Our entire jury system is anchored to the jurors' determination of credibility of witnesses and the weight to be given their testimony."). Morrison Knudsen is not entitled to summary judgment establishing that it conducted a due inquiry where the only "evidence" of such an inquiry is the self-serving and unsupported declaration of one of its executives.

Ample evidence exists from which a jury could conclude not only that Morrison Knudsen failed to conduct a due inquiry, but that any reasonable inquiry would have lead to only one "reasonable belief": that the San Cristobal Project was a precious metals project. There are literally volumes of materials indicating San Cristobal was, from the outset, anticipated to be primarily a silver mine. Apex Silver, the owner of the San Cristobal Project, has consistently characterized San Cristobal as a silver zinc mine and has, in both public filings and press releases, constantly underscored the significance of San Cristobal's silver. Apex Silver, in its own words, "is one of a limited number of mining companies with a primary focus on silver exploration, development and production." Facts ¶ 6. Because Morrison Knudsen failed to consider such "information originating from the mine owner," particularly information regarding the "mine owner's perspective and declared target," it is the opinion of MK Gold's expert that Morrison Knudsen "did not perform a 'due inquiry' sufficient to determine the character of San Cristobal, nor to form a reasonable belief that San Cristobal would not be primarily engaged in the mining of an production of silver." McAllister Report at 12.

There is another reason for a jury to question the reasonableness of Morrison

---

(footnote continued from previous page)

Knudsen's "due inquiry": Mr. Silver's expert report contains a fundamentally false factual

assumption. In section 5 of his report, Doug Silver analyzes the largest silver producing

mines worldwide and inquires whether the owner characterizes such mines as "primary silver"

mines. Discussing the Mt. Muro Mine in Indonesia, owned by Aurora Gold, Mr. Silver makes

the following observation:

> Aurora Gold classifies itself as a gold mining company. Its only
> production is derived from the Mt. Muro mine. Therefore, it must
> classify Mt. Muro as a primary gold mine.

Apex Silver classifies itself as a silver mining company. Apex Silver's only property nearing

actual production is San Cristobal. Using Mr. Silver's reasoning, Apex Silver must then

classify San Cristobal as a primary silver mine. Over the past four years, Apex Silver has in

fact consistently classified San Cristobal as a "silver-zinc" mine. See Facts ¶¶ 10, 26, 34.

Although Mr. Silver gives weight in his report to the manner in which mine operators

characterize their mines, he does not even mention the dozens of instances over the past five

years in which Apex referred to San Cristobal as a silver mine. Rather, Mr. Silver ignores

those statements and instead asserts that Apex Silver has characterized San Cristobal as a

"zinc-lead-silver deposit," a statement that is, based on the record, wholly insupportable.

  In essence, Mr. Silver established a method for determining whether a mine is

primarily silver (how does the owner characterize the mine), then invented facts to explain

why applying that method in this case means San Cristobal is not a primary silver mine (Apex

characterizes San Cristobal as a zinc mine). Mr. Silver's assumption of a false fact and his

reliance on that fact in reaching his conclusions render his expert report inadmissible. "[A]n

expert may not assume a fact and then apply his expertise to the assumed fact to produce an

opinion." <u>Dana Corp. v. American Standard, Inc.</u>, 866 F.Supp. 1481, 1501 (N.D.Ind. 1994).

Moreover, "[w]hen the assumptions made by an expert are not based on fact, the expert's

testimony is likely to mislead the jury, and should be excluded by the district court." <u>Tyger</u>

<u>Const. Co. Inc. v. Pensacola Const. Co.</u>, 29 F.3d 137, 142 (4th Cir. 1994).

 Even if the Court determines that Mr. Silver's report should not be excluded, it is the

province of the jury to determine whether Mr. Silver made reasonable assumptions in reaching

the all-important conclusion that San Cristobal is not a silver mine.  The importance of the

jury in this capacity cannot be overstated:

> The purpose of admitting the testimony of an expert witness is, of
> course, to assist the jurors in understanding the evidence or to
> determine a fact in issue. It remains the duty of the jury to evaluate the
> testimony of expert witnesses, just as all other witnesses, and to reach
> conclusions as to its worth and weight. **Our entire jury system is
> anchored to the jurors' determination of credibility of witnesses
> and the weight to be given their testimony.**

*Moe v. Avions Marcel Dassault-Breguet Aviation*, 727 F.2d 917, 929-930 (10th Cir. 1984)

(emphasis added).  Assuming Mr. Silver testifies at trial, the jury must have the opportunity to

evaluate Mr. Silver's credibility and weigh his expert testimony accordingly.

 The jury may also question whether Mr. Silver is in fact an "independent expert."  In

his deposition, Mr. Silver testified that he is "very close friend[s]" with Ta Li, a key member

of Morrison Knudsen's mining group.  Facts ¶ 22.  Moreover, Mr. Silver actually employs Mr.

Li's wife as an assistant in his office.  *Id.*  Mr. Silver's connections with the Li's is another

factor that the jury can consider when determining Mr. Silver's credibility.  Because granting

Morrison Knudsen's Motion for Summary Judgment would deny the jury any opportunity to

evaluate Mr. Silver's credibility and to determine what weight, if any, to give his conclusion

that San Cristobal is not a precious metals project, Morrison Knudsen's motion for summary

judgment must be denied.

### 2.    There is a Genuine Dispute as to Whether San Cristobal is a Precious Metals Mining Project.

Morrison Knudsen's Motion for Summary Judgment must be denied because the

primary question at issue in this litigation, whether San Cristobal is a precious metals mining

project, is still highly disputed.  In asserting that San Cristobal is a precious metals mining

project as defined under the Noncompete Agreement, MK Gold relies primarily on (a) the

expert testimony of Frank McAllister, and (b) Apex Silver's own statements in public

documents filed with the SEC and in press releases.[2]

First, Frank McAllister, MK Gold's expert witness, concludes in his expert report that

at all times relevant to this litigation, "proposed mining activities at San Cristobal, over the

life of the mine, would be primarily engaged in the mining of silver, and primarily result in the

production of silver."  Facts ¶ 43.  That report is based on a comprehensive review of

documents including Apex Silver's SEC filings and press releases, Apex tender documents

and financial models, the 1999 Feasibility Study, and numerous industry analyst reports.  Mr.

McAllister's report contradicts Mr. Silver's conclusion that San Cristobal is not a precious

metals mine, and creates a genuine factual dispute regarding that issue.

Where plaintiff and defendant will present competing expert testimony at trial, it is for

---

[2]  In addition to these issues, there are many other facts in the record supporting MK Gold's claim that San Cristobal is and always was a precious metals mine.  For example, Steven Antony, who was a Morrison Knudsen employee at the time Morrison Knudsen began pursuing participation in San Cristobal, testified that Morrison Knudsen knew in 1998 that San Cristobal was a silver mine.  However, Morrison Knudsen determined that, to avoid problems arising out of the Noncompete Agreement, it would have to "portray . . . the opportunity as a (footnote continued on next page)

the jury to decide which expert to believe. *See, e.g., Lust v. Clark Equipment Co., Inc.*, 792 F.2d 436, 439 (4th Cir. 1986) ("it was for the jury to decide which of the experts was more credible, which used the most reliable data, and whose opinion—if any—the jury would accept." (quoting *Grenada Steel Industries v. Alabama Oxygen Co.*, 695 F.2d 883 (5th Cir. 1983)). "At summary judgment, moreover, courts normally assume that the trier of fact would credit the expert testimony proffered by the nonmovant." *Den Norske Bank AS v. First Nat. Bank of Boston*, 75 F.3d 49, 58 (1st Cir. 1996). Because MK Gold and Morrison Knudsen will present conflicting expert testimony at trial regarding the nature of the San Cristobal Project, Morrison Knudsen's Motion for Summary Judgment should be denied.

Second, Apex Silver has consistently identified San Cristobal as a silver project. In SEC filings and press releases from 1997 through 2001, Apex has underscored San Cristobal's silver content and has, in literally dozens of instances, labeled the project as a "silver-zinc" play. *See* Facts ¶¶ 26, 34. In fact, Apex has unequivocally stated that its corporate strategy is to "[o]ption[ ] properties that are **not predominantly silver**." Facts ¶ 35. It is undisputed that Apex has never optioned its interests in the San Cristobal Project. Accordingly, if Apex Silver's corporate strategy means anything, the fact that Apex never optioned San Cristobal indicates that Apex Silver considers the San Cristobal Project to be a "predominantly silver" property. Morrison Knudsen's own expert has stated that when a property owner "list[s] silver as the first product [it] implies [silver] is the greatest contributor to revenues." Facts ¶ 28. Therefore the fact that Apex Silver repeatedly and consistently

---

(footnote continued from previous page)

nonprecious metal opportunity and look at it from another perspective." Facts ¶ 17.
(footnote continued on next page)

listed silver as the first product at San Cristobal strongly suggests that, even under Morrison Knudsen's analysis, Apex believed silver would be the greatest contributor to [San Cristobal] revenues.[3]

Notwithstanding the voluminous evidence characterizing its mine as primarily silver, Apex Silver testified in its recent deposition that 70 percent of San Cristobal's revenues would come from zinc and lead based on an undisclosed internal proforma containing undisclosed silver price assumptions and not disclosing how the costs of mining, milling, smelting, refining, freight and transportation would be allocated.[4] A reasonable jury could find Morrison Knudsen's activities at San Cristobal to be a breach of the Noncompete Agreement notwithstanding this most recent self-serving testimony in this litigation.[5] However, if Apex Silver's probable assumptions are used, San Cristobal's revenues will be 51.1 percent silver and 47.7 percent zinc. *Id.* Silver remains the primary metal even after the September, 1999 feasibility study.

The best Morrison Knudsen can claim after September, 1999 is that whether silver is the greater metal over the life of the mine (17 years) is a close question and depends on the assumptions made as to the price of silver, lead and zinc for 17 years and the allocation of

---

(footnote continued from previous page)

[3] Frank McAllister suggests in his expert report that the question of which metal "is the greatest contributor to revenues" is not, under the Noncompete Agreement, the proper inquiry. However, even if it were the proper inquiry, the facts in this case clearly demonstrate that Apex anticipated that silver would be the greatest contributor to San Cristobal's revenues.

[4] Apex Silver never testified that "the San Cristobal Project is very much a nonprecious metals mine." Morrison Knudsen Memo at 6.

[5] Apex has not reclassified its mine as a zinc mine or otherwise informed its investors or the SEC that it is now developing or marketing a zinc mine, nor is it undertaking to divest the property.

costs of production (mining, milling, smelting, refining, transportation). This close question—if conservative numbers are used—only applies after September, 1999. Based on earlier feasibility studies, San Cristobal was clearly considered a silver mine. Morrison Knudsen undertook activity and made its first bid long before September, 1999. Doing so violated the Noncompete Agreement. Doing so contributed to Morrison Knudsen's being awarded the San Cristobal mining services contract. Moreover, sufficient post-feasibility materials exist to warrant a reasonable jury finding in MK Gold's favor. Given the games Morrison Knudsen has played with its bids, a jury could disregard its evidence altogether and/or believe the substantial *public* representations regarding the primary nature of the silver mining at San Cristobal. Morrison Knudsen's Motion for Summary Judgment must therefore be denied.

## CONCLUSION

For the reasons set forth above, Morrison Knudsen's Motion for Summary Judgment Regarding the San Cristobal Project should be denied.

DATED this 12ᵗʰ day of March, 2001.

VAN COTT, BAGLEY, CORNWALL & MCCARTHY

By: _____
    David A. Greenwood
    Stephen K. Christiansen
    Attorneys for Plaintiff MK Gold Company

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12ᵗʰ day of March, 2001, I caused a true and

correct copy of MK GOLD'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S

MOTION FOR SUMMARY JUDGMENT ON SAN CRISTOBAL to be hand delivered, to

the following counsel of record:

> Brent O. Hatch, Esq.
> HATCH, JAMES & DODGE
> 10 West Broadway, Suite 400
> Salt Lake City, Utah 84101
>
> Alan L. Sullivan, Esq.
> SNELL & WILMER
> Gateway Tower West
> 15 West South Temple, Suite 1200
> Salt Lake City, Utah 84101

# Exhibits/ Attachments to this document have **not** been scanned.

# Please see the case file.