Brent O. Hatch (5715)
Mark R. Clements (7172)
HATCH, JAMES & DODGE
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666

Attorneys for Defendants

FILED
CLERK. U.S. DISTRICT COURT
20 MAR 01 AM 9:25
DISTRICT OF UTAH
BY:_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MK GOLD COMPANY,<br><br>Plaintiff,<br>v.<br><br>WASHINGTON GROUP INTERNATIONAL, f/k/a MORRISON KNUDSEN CORPORATION, a Delaware corporation,<br><br>Defendant. | **DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT REGARDING THE SAN CRISTOBAL PROJECT** |
| LEUCADIA NATIONAL CORPORATION, a New York corporation,<br><br>Plaintiff,<br>v.<br><br>WASHINGTON GROUP INTERNATIONAL, f/k/a MORRISON KNUDSEN CORPORATION,<br><br>Defendants. | Civil No. 2:96CV00935S<br><br>Civil No. 2:98CV 0327S<br><br>Judge Ted Stewart<br><br>Magistrate Judge Ronald N. Boyce |

Defendant Washington Group International ("Washington") respectfully submits this Reply Memorandum in Support of Motion for Summary Judgment Regarding the San Cristobal Project.

## INTRODUCTION

MK Gold's Opposition Memorandum entirely ignores two critical facts that have substantially changed the relevant issues regarding San Cristobal and mandate summary judgment in Washington Group's favor. First, as MK Gold was aware several days before it filed its Opposition Memorandum, Apex, the owner of the San Cristobal Project, have terminated any involvement by Washington Group whatsoever in the San Cristobal Project. Washington Group will not be performing any contract mining or other work with respect to the project and will not be obtaining any profits related to the project. MK Gold's statement to this Court that issues "related to MK Gold's damages" arising out of Washington Group's "operation" of the San Cristobal project have not changed in the last three months is absolutely false. The issues have completely changed.

Second, MK Gold sought leave of this Court so that it could conduct discovery regarding the San Cristobal Project and immediately served subpoenas on Apex, the owner of the San Cristobal Project, regarding the issue of the materials to be produced from the project. MK Gold represented to this Court that such discovery was critical and that it could not file its expert report on San Cristobal until after the depositions were completed. MK Gold took the depositions of Apex's President, Mr. Keith Hulley, and Apex's Chief Financial Officer, Mr. Mark Lettes. Both gentlemen testified unequivocally that *70% of the net revenues from the San*

ii

*Cristobal Project would result from zinc and lead*. Mr. Hulley further testified that MK Gold never bid on the project, that MK Gold was not qualified to bid on the project, and that Washington Group never did anything to cause Apex to not award the project to MK Gold. Despite representing to this Court that this discovery was critical to the issues, MK Gold's expert ignored this testimony in his report and MK Gold ignored it in its Opposition Memorandum.

MK Gold, due to no fault of Washington Group, never even bid on the San Cristobal Project. That fact is undisputed. MK Gold's damage claim asserts a theory of disgorgement of profits. Because Washington Group indisputably will not be performing any mining on the project and will not be obtaining any profits, MK Gold's claim to the disgorgement of Washington Group's future profits related to the project must be dismissed. Moreover, based on the undisputed evidence, San Cristobal is a nonprecious metals mining project and Washington Group's pursuit of San Cristobal is not a breach of the Noncompete Agreement.

## STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

1. On March 5, 2001, Apex canceled its prior notice of intent to award the mining and mine shop facilities contract to Washington Group. Apex and Washington Group never entered into a contract. Washington Group no longer has any involvement in the San Cristobal Project and will not be obtaining any profits from the project. [Exh. 1, Letter dated March 5, 2001 from Mark Lettes of Apex to Washington Group.]

2. At the February 8, 2001, 30(b)(6) deposition of Apex conducted pursuant to a subpoena issued by MK Gold, Apex's President, Keith Hulley, and Chief Financial Officer, Mark Lettes, both testified that 70% of the net revenues from the San Cristobal Project would

result from zinc and lead. [Exh. 2, Deposition of Mark Lettes ("Lettes Depo.") at 35-52; Exh. 3, Deposition of Keith Hulley ("Hulley Depo.") at 41-49.] MK Gold did not dispute this fact in its Opposition Memorandum. Mr. Lettes further testified as follows:

> *"Zinc represents about 60 percent of the revenues of the project under almost any reasonable price assumption", "lead represents about 10 percent" and "[s]ilver is about 30." [Exh 2, Lettes Depo. at 51-52.]
>
> *Apex determines net revenues for the San Cristobal Project on a "very, very regular basis." [Id. at 37.]
>
> *Apex's process of determining net revenues at San Cristobal involves several people: "Well, using grade, recovery and smelter terms and market prices, that means that you are going to have the geologist. That would be Larry Buchanan who discovered the property. It would be the outside consultants who do the reserve estimates. Then on the recoveries, you're talking with Mac DeGuire and again the outside consultant who work with him. On the net smelter – on the smelter terms you'd be dealing with Ed LeBlanc and obviously with the smelters. And then on the marketing, on the price assumptions, I would be probably the primary player on that one." [Id. at 39-40.]
>
> *There is a substantial amount of work that went into "creating a financial model that represents the mine" and that "the primary purpose of the model is to determine what the economics of the project are." [Id. at 42-43.]
>
> *The model accounts for capital costs, operating costs, gross revenues, net revenues, taxes, mining costs, shipping costs, and costs associated with determining net smelter returns. [Id. at 43.]
>
> *Apex allocates costs associated with the production of zinc and silver "based on the revenue from each metal", and then the revenue from lead is "subtracted from the silver cost to come up with silver's cost. You do not subtract any of the lead cost from the zinc concentrate." [Id. at 48.]
>
> *Apex's model allocates smelting costs to zinc and silver "[b]ased on the terms of the contracts. Zinc has its own specific cost. And then for silver, they get allocated some of the costs based on their deduction." [Id. at 49.]

3. Mr. Lettes further testified that Deutsche Bank Securities, Inc. ("Deutsche") is an advisor to Apex and has been appointed by Apex as the lead financial arranger for the project and

iv

will be the "guys that are going to put up the money." [Id. at 35.] Prior to Washington Group submitting its bid in February 2000, Apex gave Washington Group an independent report Deutsche prepared on the San Cristobal Project, dated November 25, 1999. In its report, Deutsche states that "approximately 70% of the net revenues" from the San Cristobal Project "comes from base [i.e. nonprecious] metals." Deutsche also states that Apex, based on the economic terms of the San Cristobal Project, "is very much a base metal company." [Opening Mem., Exh. C, Deutsche Report.]

4.     The annual quantities of material to be moved as set forth in the mine plan Apex provided Washington Group prior to Washington Group's first bid on the San Cristobal Project in 1999 was essentially the same as the annual quantities of material to be moved in the mine plan provided to Washington Group prior to Washington Group's second bid in 2000. Based on the metal prices existing during both the 1999 advisory bid process and the 2000 binding bid process, calculations performed by Washington Group at the time showed that during both bid processes, approximately 70% of the revenues from the San Cristobal Project would result from zinc and lead. [Exh. 4, Affidavit of Rodney O. Pace ("Pace Aff.") at ¶ 3.]

5.     In his report, MK Gold's expert, Frank McAllister, made numerous assumptions regarding the allocations of costs at San Cristobal and did not allocate costs in the same manner as Apex. Mr. McAllister allocated all of the costs of transportation to zinc and lead and none of the costs to silver. He also allocated almost all of the costs of smelting to lead and zinc and almost none of the costs to silver. [Id. at ¶ 6.]

6.   Mr. Hulley testified that MK Gold never submitted a bid on San Cristobal and was never asked to submit a bid because MK Gold "was not qualified." [Exh. 3, Hulley Depo. at 35.] Mr. Hulley testified further as follows:

> It was our judgment that MK Gold's experience and scale size of company, scaled operations, was less than we thought would be competitive from the banking review of bankability standpoint. So we limited our bidder list to those we believed would be well recognized in experience and size of operation with South American experience to qualify, from not only our point of view but particularly from the bank's point of view.

[Id. at 34.]

7.   Mr. Hulley testified that Washington Group did not do anything that in any way caused Apex to not enter into any type of business relationship with MK Gold with respect to the San Cristobal project. [Id. at 41.]

8.   MK Gold's designated 30(b)(6) corporate witness on the issue of MK Gold's pursuit of San Cristobal, Tom White, stated unequivocally that MK Gold does not claim that the contract mining opportunity at San Cristobal would have been awarded to MK Gold if it had not been awarded to Washington Group. [Exh. 5, Deposition of Tom White at 257.]

### RESPONSE TO MK GOLD'S PURPORTED FACTS

In an attempt to confuse the relevant issues, MK Gold has set forth a long fact statement. In that statement, however, MK Gold only disputes paragraphs 3, 4, and 6 of Washington Group's facts and does so "based on the conclusions reached in Mr. McAllister's report." [MK Gold's Opp. Mem. at 16.] For the reasons set forth in Part I of this Memorandum, Mr. McAllister's report does not create disputes of fact sufficient to defeat summary judgment.

Many of MK Gold's other facts are not material and in many cases misrepresent the record. For example, MK Gold claims in paragraph 38 of its facts that LeRoy Wilkes of Washington Group could not have conducted a due inquiry because he did not review a 1999 feasibility study regarding San Cristobal. Mr. Wilkes testified, however, that Washington Group was not given access to Apex's confidential feasibility report. [Exh. 5, Deposition of LeRoy ("Wilkes Depo.") at 37; Exh. 4, Pace Aff. at paragraph 7 (stating that Apex did not give the feasibility study to Washington Group prior to the time Washington Group submitted its bids).] Mr. Wilkes certainly could not review a feasibility study that Washington Group was not given.

As another example, MK Gold claims in paragraph 20 of its facts that Mr. Wilkes "did not review" the December 1998 Apex Tender Documents. The document shown to Mr. Wilkes was only a small portion of the larger Tender Document and Mr. Wilkes testified that at the time, he could not recall if it was material he used in his due inquiry. [Id. at 28.]

As a final example, MK Gold attempts to criticize Mr. Wilkes because he could not recall reviewing a December 1997 report from Salomon Smith Barney. That report was issued fourteen months prior to the time Washington Group submitted its first bid on San Cristobal and was based on an abandoned mine plan and outdated reserve numbers that are "very different" from those subsequently existing at San Cristobal. [Exh. 3, Hulley Depo. at 44-45.] In April 1999, just subsequent to the time Washington Group submitted its bid, Salomon Smith Barney issued a report stating that based on current reserves, zinc would account for better than "50% of the revenues" from the San Cristobal Project. [Exh. 6, Salomon Smith Barney Report dated April 1999 at 3, 17.]

vii

Several of MK Gold's other purported facts are similarly misleading. More important, they do not create disputes of material fact. For the reasons set forth below and in Washington Group's Opening Memorandum, Washington Group's Motion for Summary Judgment should be granted and MK Gold's claim to damages related to the San Cristobal Project should be dismissed

## ARGUMENT

I.   **MK GOLD HAS NOT LOST PROFITS WITH RESPECT TO THE SAN CRISTOBAL PROJECT.**

MK Gold has simply misrepresented to this Court that issues relating to MK Gold's damage claims regarding San Cristobal have not changed.[1] [MK Gold's Opp. Mem. at 19.] The issues have completely changed. Washington Group will not perform any "operations" whatsoever at San Cristobal and will not obtain any profits. MK Gold has no claim for the disgorgement of Washington Group's future profits and must instead claim that it somehow *lost profits* with respect to the San Cristobal Project. That claim is impossible.

To recover lost profits relating to San Cristobal, MK Gold must prove to a reasonable certainty that had Washington Group not allegedly breached the Noncompete Agreement, MK Gold would have obtained the San Cristobal Project and the project would have resulted in profits to MK Gold. See Ripsom v. Beaver Blacktop, Inc., 1988 WL 32071 (Del. Super. 1988) ("Lost profits may be recovered only if the profits can be ascertained with reasonable certainty, and are not speculative or contingent."); J.B.N. Morris v. Homco Inter., Inc., 853 F.2d 337, 344 (5th Cir. 1988) (damages for breach of noncompete agreement only allowed where party shows "that it would have made the sales" and gained the profits "in the absence of competition"); National Controls Corp. v. National Semiconducter Corp., 833 F.2d 491, 496 (3rd Cir. 1987)

---

[1] MK Gold's argument that Washington Group's Motion is somehow foreclosed by the Court's prior ruling is disingenuous. The Court found at the summary judgment hearing that *at that time* factual issues existed as to the "potential damage to MK Gold" based on damages for Washington Group's alleged "violation of the noncompete agreement from the *operation by MKC* of the San Cristobal project." [Transcript of Motion Hearing, October 2, 2000 at p. 84 (emphasis added).] Subsequent to that ruling, the Court entered an order, based on the parties' stipulation, that the parties could conduct additional discovery and file summary judgment motions. MK Gold received the "benefit of its bargain" in being allowed to conduct additional discovery and must now live with that bargain, which includes the right of Washington Group to file the present summary judgment motion.

1

(vacating award of lost profits holding that "[a]n award of lost profits required speculation ... that, absent [defendant's] breaches, [a third party] would have proceeded with the project and ... would have chosen [plaintiff] as a supplier."). MK Gold has not and cannot meet this burden for any of four independent reasons.

First, it is undisputed that Washington Group has not obtained the project and will not be performing any contract mining at San Cristobal. [Undisputed Facts at ¶ 1.] Thus, Washington Group will not be obtaining any profits that could have gone to MK Gold. At this time, the project has not been awarded to Washington Group or anyone else. Any actual profits from the project (assuming the project ever goes forward and any profits ever result) will be obtained by a qualified party other than Washington Group.

Second, MK Gold does not claim that Apex would have awarded the project to MK Gold if the project had not been awarded to Washington Group. MK Gold did not even bid on the project. [Id. at ¶ 6.] At the recent 30(b)(6) deposition of MK Gold, Tom White, MK Gold's designated witness on the issue of MK Gold's pursuit of San Cristobal, stated unequivocally that MK Gold does not claim that the contract mining opportunity at San Cristobal would have been awarded to MK Gold if it had not been awarded to Washington Group. [Id. at ¶ 8.]

Third, Mr. Hulley, Apex's President, testified that Apex never asked MK Gold to submit a bid because MK Gold "was not qualified." Mr. Hulley testified that it was Apex's "judgment that MK Gold's experience and scale size of company, scaled operations, was less than [Apex] thought would be competitive from the banking review of bankability standpoint." [Id. at ¶ 6.]

2

Fourth, Mr. Hulley testified that Washington Group did not do anything that in any way caused Apex to not enter into any type of business relationship with MK Gold regarding the San Cristobal project. [Id. at ¶ 7.]

It is undisputed that Washington Group will not obtain any profits from San Cristobal and that MK Gold never submitted a bid on the project and has not lost any profits. MK Gold's damage claim with respect to San Cristobal must be dismissed.

## II.    SAN CRISTOBAL IS PRIMARILY AND OVERWHELMINGLY A NONPRECIOUS METALS MINING PROJECT.

Apex's San Cristobal Project is primarily a nonprecious metals mining project. Apex's President, Keith Hulley and its Chief Financial Officer, Mark Lettes, both recently testified, in response to a subpoena issued by MK Gold, that 70% of the project's net revenues are attributable to zinc and lead. [Id. at ¶ 2.] MK Gold did not dispute that fact. Instead, it argues that San Cristobal should be considered a precious metals project because Apex has publicly hyped the silver aspect of the project and because MK Gold's expert, Frank McAllister, has opined that if one were to ignore the undisputed facts and use a series of assumptions regarding costs and the allocation costs, he could construct a scenario on paper where silver could be viewed as San Cristobal's dominant revenue contributor. [MK Gold Opp. Mem. at 27.] Neither of these claims creates a genuine dispute of material fact regarding the materials to be produced from the San Cristobal Project.

Whether Apex promotes itself as a company focused on silver is irrelevant to the issue under the Noncompete Agreement of whether San Cristobal will primarily result in the mining of

3

or the production of precious metals. The numbers regarding the metals to be mined and produced at San Cristobal are what they are and MK Gold does not dispute them.

For the same reason, assumptions and opinions by a hired expert about what the net revenues from the San Cristobal Project could be if certain accounting practices were used are irrelevant where the *actual net revenues* to be generated from the project are known and undisputed. As stated, MK Gold did not dispute that based on Apex's *actual numbers*, 70% of the net revenues from the San Cristobal Project will result from lead and zinc. As the law below makes clear, the portion of Mr. McAllister's report incorporating unsupported assumptions about costs and the allocation of costs does not create a dispute of fact.

In <u>Matsushita Electric Industrial Company v. Zenith Radio Corporation</u>, 474 U.S. 574 (1986), the Supreme Court upheld a district court's grant of summary judgment in a case involving claims of price fixing. The Court found persuasive the district court's analysis regarding its refusal to give credence to the report of the plaintiff's expert. The Court stated:

> The relevant study is not based on actual cost data; rather, it consists of expert opinion based on a mathematical construction that in turn rests on assumptions about petitioners' costs. The District Court analyzed those assumptions in some detail and found them both implausible and inconsistent with record evidence. ... We find the District Court's analysis persuasive.

<u>Id.</u> at 594 n. 19.

In <u>Brook Group Ltd. v. Brown & Williamson Tobacco Corp.</u>, 113 S. Ct. 2578, 2598 (1993), the Supreme Court held that "when indisputable record facts contradict or otherwise render the [expert] opinion unreasonable, it cannot support a jury's verdict. ... Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute

4

for them." Delaware law, which applies under the Noncompete Agreement, supports this conclusion. See Tse v. Ventana Medical Systems, Inc., 123 F. Supp.2d 213, 226 (D. Del. 2000) (citing Brook Group and granting summary judgment where conclusions of plaintiff's expert were based on incorrect assumptions).

Similarly, in Advent Systems, Limited v. Unisys Corporation 925 F.2d 670 (3d Cir. 1991), the court reviewed the admissibility of expert testimony as to damages caused by a breach of contract. The plaintiff's expert testified to an amount of lost profits based on projected total industry figures for the years 1987 and 1988. By the time the case went to trial, actual sales figures for the industry were available and showed that industry sales were substantially lower. In reversing the jury's verdict, the Third Circuit stated that it had "serious reservations about the validity of expert testimony based on prior predictions of sales for a given period when actual performance data for that same time span are available." Id. at 682. See also Tyger Const. Co., Inc. v. Pensacola Const. Co., 29 F.3d 137, 142 (4th Cir. 1994) ("When the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead the jury, and should be excluded by the district court."); Dana Corp. v. American Standard, Inc., 866 F. Supp. 1481, 1501 (N.D. Ind. 1994) ("An expert may not assume a fact and then apply his expertise to the assumed fact to produce an opinion.").

A party "cannot create a genuine issue of fact merely by presenting an expert witness who is willing to express an unsupported opinion that favors the party's position." Porter v. Whitehall Laboratories, Inc., 791 F. Supp. 1335, 1347 (S. D. Ind. 1992). "[U]nsupported assumptions and conclusory allegations advanced by an expert are neither admissible at trial, nor are they entitled

to any weight when raised in opposition to a motion for summary judgment." Reazin v. Blue Cross & Blue Shield of Kan., Inc., 663 F. Supp. 1360, 1479 (D. Kan. 1987). If the law were otherwise, summary judgment would never be granted because it always possible to find an expert who will make assumptions and provide a contrary opinion. See Olympia Equipment Leasing Co. v. Western Union Telegraph Co., 797 F.2d 370, 382 (7th Cir 1986) ("There is hardly anything, not palpably absurd on its face, that cannot now be proved by some so-called experts.")

MK Gold states in its Opposition Memorandum that in the opinion of its expert, "costs of mining, shipping, smelting and refining" should be considered to determine the "dominant revenue contributor" at San Cristobal. [MK Gold Opp. Mem. at 17.] Even assuming this is correct, in determining that 70% of the net revenues at San Cristobal would result from zinc and lead, Apex specifically accounted for capital costs, operating costs, gross revenues, net revenues, taxes, mining costs, shipping costs, and costs associated with smelting and refining. [Id. at ¶ 2.] Apex then allocated the costs associated with the production of zinc and silver "based on the revenue from each metal", with the revenue from lead being "subtracted from the silver cost to come up with silver's cost." [Id.]

Mr. McAllister ignores these actual numbers in his report and instead *assumes* costs and *assumes* the allocation of those costs. [Id. at ¶ 5.] As the above law makes clear, this Court need give no credence to Mr. McAllister's unsupported assumptions when the actual facts are available and undisputed.

Federal Rule of Evidence 702 requires that to be admissible, expert testimony must "assist the trier of fact to understand the evidence." Mr. McAllister's analysis which ignores the

6

undisputed evidence in favor of inapplicable assumptions does not assist the trier of fact and does not create a dispute of fact sufficient to defeat summary judgment.[2] The San Cristobal Project will primarily result in the production of nonprecious metals. Accordingly, Washington Group's pursuit of the project is not a breach of the Noncompete Agreement.

### III. WASHINGTON GROUP COMPLIED WITH SECTION 2.2 OF THE NONCOMPETE AGREEMENT IN PURSUING THE SAN CRISTOBAL PROJECT.

Washington Group complied with section 2.2 of the Noncompete Agreement in pursuing the San Cristobal Project. Washington Group's due inquiry and the independent report from Mr. Silver both concluded that the San Cristobal Project is expected over the life of the project "not to be primarily engaged in the mining of or not primarily result in the production of Precious Metals." [Opening Mem. at p. 6.]

In its Opposition Memorandum, MK Gold claims that Washington Group could not have had a reasonable belief that the San Cristobal Project would primarily result in the production of nonprecious metals because Apex touted itself as a company with a "primary focus on silver" and issued press releases "underscor[ing] the significance of San Cristobal's silver." [MK Gold Opp. Mem. at 24.] This argument is ridiculous. What matters under the Noncompete Agreement is the metals to be mined and produced at the project – not how Apex promotes its company. Apex's President and its Chief Financial Officer testified under oath that 70% of the net revenues from San Cristobal will result from lead and zinc. MK Gold did not dispute this fact. Deutsche

---

[2] Indeed, how is it helpful to a jury to have an expert give a contradictory opinion about what the net revenues could possibly be from a mine, when the actual net revenues are undisputed? See Biocore, Inc. v. Khosrowshahi, 183 F.R.D. 695, 699 (D. Kan. 1998) ("The touchstone of Fed.R.Evid. 702 ... is the helpfulness of the expert testimony.") Expert testimony that will confuse the jury is inadmissible.

Bank, the party putting up the money for the project, has publicly stated that "approximately 70% of the net revenues" from San Cristobal will come "from base [i.e. nonprecious] metals" and that Apex, based on the economic terms of the San Cristobal Project, "is very much a base metal company." [Undisputed Facts at ¶ 3.] When the two parties with the most information regarding the project (and both of whom are independent) make clear that San Cristobal will primarily result in the mining of and production of precious metals, how can Washington Group's identical belief be unreasonable?

MK Gold also claims that the method used by the independent expert, Doug Silver, to measure the metals to be produced at San Cristobal was not the best available method so apparently there is a dispute of fact about whether Mr. Silver was an "independent expert." [MK Gold's Opp. Mem. at 26.] This argument is again misplaced. MK Gold's expert admits there are several available methods for measuring the metals to be produced from a poly-mettallic project such as San Cristobal. [McAllister Report at p. 9 ("Various methods may be employed to evaluate the economic character of a poly-mettallic mine.")] He then concludes that in his opinion, the method he used was the best. [Id.] Even if that were true, his belief that his method is better does not create a dispute of fact regarding whether Mr. Silver was independent. Indeed, MK Gold does not dispute in any manner the results of any of the calculations Mr. Silver performed using his method. The Noncompete Agreement does not specify what method should be used and does not provide that a method using assumptions about the allocation of costs (Mr. McAllister's method) is preferred to a method using actual numbers (Mr. Silver's method).

MK Gold next claims that there is a dispute of fact regarding whether Washington Group's due inquiry was sufficient. MK Gold is again wrong. The conclusion reached by Washington Group's due inquiry was essentially the same as that testified to by Apex regarding the actual metals to be produced from the San Cristobal Project. Washington Group's Executive Vice President, LeRoy Wilkes, testified that he read all public information he was aware of regarding the project. [Exh. 5, Wilkes Dep. at 2, 6, 29.] Mr. Wilkes also testified that on numerous occasions during the relevant period he performed calculations to determine the metals to be produced at San Cristobal. The calculations were specifically described during Mr. Wilkes' deposition and involved numbers regarding the tons of materials to be produced, grades of ore, recoveries, metal losses and price.[3] [Id. at 15-16.] His calculations repeatedly determined that 70% of the net revenues from the project would result from lead and zinc. [Id. at 20.]

Again, MK Gold does not dispute the results Mr. Wilkes achieved through his calculations, but only states that the method Mr. Wilkes used, which was recognized and acknowledged by MK Gold's expert as a method that "may be employed to evaluate the economic character of a poly-mettallic mine," was not the same method that Mr. McAllister used. The Noncompete Agreement does not specify the method that must be used, and does not

---

[3] MK Gold attempts to make an issue of the fact that Mr. Wilkes did not save his handwritten calculations. This is a red herring. As Mr. Wilkes testified, the calculation takes minutes to perform and was done regularly on a scrap of paper each time information was released regarding the grades and recoveries at San Cristobal. There is no dispute regarding the grades and recoveries. That information is public and the calculations are easily reproducible for any given time period. Moreover, MK Gold threw away calculations that it had performed to determine the minerals to be produced at the project. Tom White of Mk Gold testified that he ran several different spreadsheets regarding the minerals to be produced at the project. When asked at his deposition where the spreadsheets were, he responded, "Probably in the garbage." He later testified that although he could not recall, the spreadsheets may have been run on the computer and then destroyed. [Exh. 4, White Depo. at 162-163.] MK Gold has claimed that it cannot produce a copy of the computer program or the formula Mr. White used because they no longer exist.

9

provide that a method using assumptions about the allocation of costs is preferred while a method using actual numbers is somehow insufficient.

## CONCLUSION

Based on the undisputed testimony of the project's owner, the San Cristobal Project is not a precious metals mining project. Even if it were, MK Gold never bid on the project and it is undisputed that Washington Group never did anything to cause MK Gold not to get the project. MK Gold's damage theory is based on disgorgement of profits. Washington Group has not and will not recover any profits from the project. Washington Group's Motion for Summary Judgment should be granted and MK Gold's request for damages related to the project should be dismissed.

DATED this 20TH day of March, 2001.

HATCH, JAMES & DODGE

By: _____
Brent O. Hatch
Mark R. Clements

## CERTIFICATE OF SERVICE

I hereby certify that on this 20TH day of March, 2001, I caused a true and correct copy of the foregoing to be hand delivered to the following:

Alan L. Sullivan
SNELL & WILMER
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, UT  84101

David A. Greenwood
VAN COTT, BAGLEY, CORNWALL & MCCARTHY
50 South Main Street, Suite 1600
Salt Lake City, UT  84145

_____

11

Exhibits/ Attachments to this document have **not** been scanned.

Please see the case file.